W. L. HOOKS et al., Petitioners,

v.

EAST TEXAS PULP AND PAPER COMPANY et al., Respondents.

No. A-9235.

Supreme Court of Texas.

May 22, 1963.

Rehearing Denied July 17, 1963.

Ernest A. Knipp, Houston, for petitioners.

Grady O. Trimble, Jr., B. F. Whitworth, Jasper, for respondents.

GREENHILL, Justice.

East Texas Pulp and Paper Company and Champion Papers, Inc., brought this suit on May 21, 1962, against the tax assessor-collector and the members of the Board of Equalization for the Hull-Daisetta Independent School District in Liberty County. Petitioner Hooks is chairman of that board. The suit was to enjoin the board from finally fixing the 1962 taxable value for their properties until they were given access to all the public records of the tax assessor-collector and to the proposed assessments for properties in the district other than their own. After entering a temporary restraining order without notice, the district court refused, upon hearing, to grant a temporary injunction. The Court of Civil Appeals has reversed and has ordered that the defendants be enjoined from acting as a board of equalization for the purpose of finally determining the taxable values of plaintiffs' property until the de-

fendants made available to plaintiffs the proposed assessed valuations for the year 1962 for all of the properties in the district. 359 S.W.2d 955.

The facts brought out at the temporary injunction hearing are as follows: East Texas and Champion are owners of several thousands of acres of timberland in the school district. They own only the surface estate. They do not own the subsurface which is part of a valuable, producing oil and gas reservoir. These mineral estates are owned mainly by a number of oil companies. The timberlands, along with ordinary real estate, homes, and businesses, are carried on the tax assessor's "B" tax roll; whereas the oil and gas interests lying beneath plaintiffs' timberland are carried on the "A" roll. The "A" roll also includes all utility properties in the district.

East Texas and Champion had theretofore rendered their properties to taxation by mailing or otherwise delivering their renditions to the assessor-collector. The affidavits attached to the renditions were taken before notaries outside of Liberty County and the school district. Similarly, the renditions of the properties of the oil companies were prepared in other counties (mainly Dallas and Harris) and mailed or delivered to the assessor-collector. These facts become relevant under International & G. N. Ry. Co. v. Smith County, 54 Tex. 1, to be discussed later herein.

East Texas and Champion claim that they were wrongfully denied access to the proposed assessments for the "A" roll properties which were needed for study and comparison prior to the hearing date when the board fixes the final taxable values of their timberland. The proposed assessments of the "A" roll properties, they assert, were necessary to prove their case of a discriminatory tax scheme at the board hearing. One of the reasons given by them as to why they needed to examine the proposed assessments on both the "A" and "B" rolls at a reasonable time before the hearing was that the total of all taxable values in the school district was planned to be increased 24% over the 1961 total taxable value. The figures on their schedule show that the raise was to be effected by increasing the oil, gas, and utility properties listed in the "A" roll by 12%; the remaining property in the district, contained in the "B" roll, was to be increased by over 105%. Thus, plaintiffs' timberland and the other "B" roll properties would bear the brunt of the new tax burden. Without access to the "A" roll proposals prior to the board meeting, East Texas and Champion argue, they would not have time or opportunity to analyze and prepare the evidence necessary to prove a discriminatory tax scheme at the board meeting.

On May 9, 1962, the Board of Equalization mailed notice to East Texas to appear on May 22, at which time the board would hear evidence and "finally fix, determine, and equalize" the 1962 taxable values on the timberland. The notice did not indicate at what value the board was proposing that the property be assessed. Champion received a similar notice directing it to appear on May 23.

On May 16, representatives of both companies, including Mr. Glen Kirby who was manager of the East Texas tax and title department, went to the tax assessor's office to obtain information about the basis of the over-all assessments for the district. Kirby testified that this was common practice among all large landowners. Upon inquiry, it was discovered that Mr. English, the assessor-collector, was away on a two-week vacation. Kirby then directed his questions to Mr. English's two assistants and to Mr. Thomas, the superintendent of schools. Kirby asked for permission to see the renditions and proposed assessments on the oil and gas properties. He was told that the information "was not available," and that it was in the hands of Thomas Y. Pickett & Co. at Dallas, Texas. Pickett & Company was the professional appraising company employed by the school district to make proposed as-

sessments on the "A" roll properties, i. e., the oil, gas, and utility properties. Appraisement and proposed assessments of the "B" roll properties were done for the board by Southwestern Appraising Company of Stamford, Texas.

At the June 4 hearing on the temporary injunction, English testified that neither he nor the board had possession of the proposed assessments of "A" roll properties prepared by the Pickett Company, although there was testimony that the "A" roll renditions had been returned by Pickett on May 22. English further stated that the proposed assessments on such properties would not be available in his office until "approximately at the time the Board of Equalization meets."

It is important, as will later be developed, that the companies at no time made demand upon, or request to, the board for the information which they sought. Neither East Texas nor Champion communicated in any manner with the board or any member of the board concerning their requests.

In so far as the right of the complaining companies to see the records of the assessor-collector are concerned, the case is moot. It was made plain to us on oral argument that these records had been made available to them at the time of trial in the district court. That is, the companies were allowed to see all of the public records which were in existence. They were not shown any proposed assessments made by the assessor-collector which would raise rendered values because, as we understand it, none had been made by him.

As the case developed in the Court of Civil Appeals, that court said, "We feel the sole question * * * is whether a taxpayer is entitled to have made available to him for inspection, *the proposed assessable values to be placed* on all other properties, at a reasonable time prior to

the hearing before the board of equalization to determine the value of such taxpayer's property."

So the first question is whether, under the facts here presented, the assessor is under a duty to make a proposed assessment of the properties of the timber companies or the oil company if he differs with the values as rendered by the taxpayers.

There are many statutes on taxation by various governmental agencies, and they leave a good deal to be desired from the standpoint of clarity. Two of these statutes fix different duties upon the assessor depending upon the method by which the rendition of the taxpayer is transmitted to him.[1] These statutes were distinguished by this Court in International & G. N. Ry. Co. v. Smith County, 54 Tex. 1 (1880). There a distinction was made between (1) renditions made directly to the particular assessor and (2) renditions forwarded to the assessor by mail or otherwise from another county, where the oath had been made before an officer of another county. The Court reasoned that where the rendition was made by the taxpayer to the assessor himself, the assessor had the opportunity to discuss values with the taxpayer. If they could not get together, and the assessor was satisfied that the rendered value was below the reasonable cash market value, Article 7211 (or its predecessors) said, in part, that the assessor "shall at once place on said rendition opposite each piece of property so rendered an amount equal to the reasonable cash market value of such property * * *; and if the person listing such property * * * is not satisfied with the value placed on the property by the assessor, he shall so notify the assessor, and if desiring so to do make oath before the assessor that the valuation so fixed by said officer on said property is excessive." The assessor is then required to furnish his rendition and

1. Articles 7211 and 7185 are made applicable to school districts by Article 1060a. All references to statutes herein are to Vernon's Civil Statutes of Texas Annotated.

the oath of the taxpayer to the commissioners court, or its equivalent here, the Board of Equalization, which shall hear evidence on the true valuation.

Article 7185 and its predecessors, on the other hand, were treated by this Court in the Smith County case as covering the situation where the taxpayer sent in his assessment from out of the county by mail, or otherwise, making an oath before an officer of another county. That statute says in part, "If the assessor is satisfied with the valuation as rendered * * *, he shall so enter the same; if he is not satisfied with the valuation, he shall refer the same to the board of equalization * * * for their action, and shall immediately notify the person from whom he received said list that he has referred said valuation to the board of equalization."

It will be noted that under this article, there is no provision for the assessor to enter *his* assessment. If he differs with the taxpayer, he is directed to refer the matter to the board for its action.

Under these circumstances, this Court said in the Smith County case:

"Where, however, the person who makes oath to the list before some other officer, does so out of the county and forwards the list by mail, the case is clearly under section 5, and the assessor, if dissatisfied, is neither required nor empowered to affix a valuation, but should refer the same to the board of equalization. And although the inventory be forwarded otherwise than by mail, if it be by the hands of some person other than the one who listed the property, or other than one who appears to be equally authorized to represent the tax-payer, the proceeding would still be under section 5." 54 Tex. 1 at 13.

 As set out above, the renditions here by the paper companies were sent in by mail from out of the county as were the renditions of the oil companies in the "A"

rolls. Under the Smith County case, the assessor was under no duty to make assessments. And, as above stated, the paper companies had not made demand upon the board of equalization for relief or for any information. The trial court therefore correctly denied the injunction here sought. Duck v. Peeler, 74 Tex. 268, 11 S.W. 1111 (1889). Inasmuch as the question of the duty of the board to furnish such information is not before us, anything we now say on that matter would be dictum. That question must therefore be reserved for such time as it is properly before the Court.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.